UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| SUNLAND CONSTRUCTION, INC., | ) | |
| Petitioner, | ) | |
| versus | ) | Civil Action No. _____ |
| RICHARD BOREK, JR., STATIX | ) | |
| ENTERPRISES, LLC | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

NOW INTO COURT, by and through undersigned counsel, comes Plaintiff Sunland Construction, Inc. ("Plaintiff" or "Sunland") and for its Complaint for Damages against Defendants Richard Borek, Jr. and Statix Enterprises, LLC, states and alleges as follows:

**NATURE OF THE ACTION**

1.      Sunland files this action against its former employee Richard Borek, Jr. ("Borek") and Statix Enterprises, LLC. Sunland employed Borek in a position of trust as Information Technology Manager ("IT Manager") and granted him access to Sunland's confidential and proprietary information, subject to the Sunland Construction, Inc. & Affiliated Companies Employee and Safety Handbook.

2.      While working for Sunland, Borek created a company named Statix Enterprises, LLC ("Statix"), which Borek used to further his scheme to defraud Sunland.

3.      Borek violated his position of trust and fiduciary duties, and committed acts of fraud, when he used Sunland's volume pricing discounts and creditworthiness to purchase cellular phones, tablets, and other equipment, based on false pretenses, and sold them, through

1

his company Southern Systems, to IBS Wireless and/or other unknown parties for his own financial gain ("Cellular Phone Scheme").

4.      Borek also violated his position of trust and fiduciary duties with Sunland when he intentionally defrauded Sunland by billing Sunland through Statix for fictitious web hosting services, Microsoft product licenses, computers, assessors, consulting hours, and internet connectivity ("Statix Scheme").

5.      Sunland brings this action for damages based on Borek's violations of the Racketeer Influenced and Corrupt Organization Act of 1970, 18 U.S.C. § 1964(c) ("RICO"), and Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").  Sunland further asserts claims against Borek for breach of fiduciary duty, and against Borek and Statix for conversion/civil theft and, alternatively, unjust enrichment.

## PARTIES

6.      Plaintiff Sunland is a Louisiana company whose principal place of business is in Eunice, Louisiana.

7.      Defendant Richard Borek, Jr. ("Borek") is an individual who upon information and belief resides and can be served at 402 Sellers Road, Duson, Louisiana, 70529.

8.      Defendant Statix Enterprises, LLC ("Staxix"), a Texas limited liability company whose principle place of business is at 9900 Spectrum Drive, Austin, Texas, 78717. Borek is the founder and Managing Member of Statix.  Statix's agent for service of process is United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, Texas 78717-78717.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the CFAA and RICO statutes provide for federal jurisdiction over claims involving unauthorized computer access and racketeering activity, respectfully.

10.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims, which arise from the same case and controversy giving rise to Sunland's federal claims against Borek and Statix under the CFAA and RICO.

11.      Venue is proper in the Western District of Louisiana because Borek resides in this District; a substantial portion of the transactions and wrongs complained of herein were committed and/or occurred in this District; and Defendants have received substantial compensation and improper benefits in this District by doing business here and engaging in numerous activities that had and continue to have an effect on this District.

## FACTUAL ALLEGATIONS

12.      Sunland is a leader in pipeline construction and related services with operations across the United States. Sunland employs approximately 2,200 employees each year.

13.      Sunland employed Borek as an Information Technology Manager ("IT Manager") from May 2012 until his resignation on August 29, 2016.  As IT Manager, Borek reported to Sunland's Chief Financial Officer, Alva West.

14.      In his capacity as IT Manager, Sunland relied on and expected Borek to employ high ethical standards, work independently, and exercise professional, independent judgment.

15.      As Sunland's IT Manager, Borek had management and oversight-responsibility of the entire Sunland computer network, email servers, help desk, and electronic storage of business information. His duties included but were not limited to:  responsibility for the daily stability and

efficiency of the Sunland IT environment including network, applications, security and communications for 11 Sunland offices; providing customer service to a diverse and remote group of 300 Sunland users; maintaining a Structured Query Language server that stores vital accounting data for Sunland; maintaining current and accurate inventory of technology hardware, software, licenses and resources on behalf of Sunland; negotiating license agreements and asset purchases with channel partners and vendors on behalf of Sunland; and developing and managing technology budget and monitoring and approving related expenditures for Sunland.

16.    Sunland's Employee and Safety Handbook includes an Electronic Communications and the Internet Policy which states pertinent part: "The Company maintains electronic communications (e-mail, voice mail and internet) to assist in the conduct of business within the Company." The policy further states "any employee who violates this policy or uses electronic communications for improper purposes will be subject to discipline, up to and including termination."

17.    On May 11, 2012, Borek executed Sunland's Handbook Receipt and Acknowledgment confirming that he "read, understood, and agrees to the follow the handbook during his employment with [Sunland]."

18.    Additionally, Sunland's Information Technology Department promulgated the Sunland Companies' Information Technology Policies, which states in pertinent part:

> **Overview**
> . . .
> Internet/Intranet/Extranet-related systems, including but not limited to computer equipment, software, operating systems, storage media, network accounts providing electronic mail, WWW browsing, and FTP, are the property of Sunland. These systems are to be used for business purposes in serving the interests of the company, and of our clients and customers in the course of normal operations. . . .

4

Effective security is a team effort involving the participation and support of every Sunland employee and affiliate who deals with information and/or information systems. **It is the responsibility of every computer user to know these guidelines, and to conduct their activities accordingly.** (Emphasis added).

**Policy**
**General Use and Ownership**
. . .

3. **For security and network maintenance purposes**, authorized individuals within Sunland may monitor equipment, systems and network traffic at any time without notice.  (Emphasis added).
. . .

**Unacceptable Use**
The following activities, in general, are prohibited. . . .

Under no circumstances is an employee of Sunland authorized to engage in any activity that is illegal under local, state, federal or international law while utilizing Sunland-owned resources.

The following activities are strictly prohibited, with no exceptions:
…
9. Effecting security breaches or disruptions of network communication. Security breaches include, but are not limited to, accessing data of which the employee is not intended recipient or logging into a sever or account that the employee is not expressly authorized to access, unless these duties are within the scope of the regular duties. For the purposes of this section, "disruption" includes, but is not limited to, networking sniffing, pinged floods, packet spoofing, denial of service, and forged routing information for malicious purposes.
…
12. Circumventing user authentication or security of any host, network, or account.

19.     The Sunland  Information Technology Policies also state:

**Rules**
The following rules are to be strictly adhered to, it is prohibited to:
. . .
- Forge or attempt to forge email message.
- Disguise or attempt to disguise your identity when sending mail.

- Sending email message using another person's email account.

. . .

In general, **any conduct** that adversely affects the ability of others to use the company's systems and networks, **or which can harm or offend others, will not be permitted**. (Emphasis added).

**Borek's Fraudulent "Cellular Phone Scheme":  Borek Caused Sunland to Purchase Unneeded Cellular Phones and Computer Equipment Which Borek Resold for his Personal Gain**

20.    At the time of Borek's hire by Sunland in May 2012, Sunland purchased and provided cellular phones, smart phones, and/or personal digital assistants (collectively hereinafter referred to "cellular phones") along with device and service lines to its employees, including superintendents who worked on assignment in the field.  For this purpose, Sunland had multiple business accounts with AT&T, Inc. ("AT&T") and Verizon Wireless ("Verizon").

21.    In late 2012, Sunland instructed Borek to take over the process of selecting and purchasing cellular phones for Sunland employees from AT&T and Verizon.  Borek was responsible for negotiating purchases of cellular phones from AT&T and Verizon in accordance with Sunland's business needs, approving necessary expenditures related to cellular phone purchases, and maintaining an accurate inventory of same.

22.    In 2012, Sunland had an average of 314 active phone lines with AT&T and/or Verizon.  This number increased to 351 in 2013 and to 466 in 2014.

23.    In an effort to contain and reduce what it viewed as increasing cellular phone costs, Sunland implemented a "bring your own device" ("BYOD") program in June 2014 to encourage employees to use their own cellular phones and cut down on the number of devices owned by Sunland.  As a result of implementing a BYOD program, Sunland reasonably expected the number of active cellular phones on Sunland's AT&T and Verizon accounts to decrease.

24.     Instead, after the implementation of the BYOD program, the number of Sunland's AT&T and Verizon active cellular phone accounts increased exponentially.  During 2015,  the number of Sunland's AT&T and Verizon accounts increased from approximately 472 in or about January 2015 to approximately 1,611 cellular phones in or about December 2015.  Further, during the first eight months of 2016, the number of Sunland's AT&T and Verizon accounts ballooned to approximately 3,608.

25.     Upon investigation, Sunland discovered Borek abused his authority as IT Manager to implement his Cellular Phone Scheme whereby he caused Sunland to purchase 1,502 cellular phones from AT&T and 1,874 cellular phones from Verizon, as well as 42 tablets from CDW, which Borek then either kept or re-sold for his own personal gain.  These 3,376 cellular phones and 42 tablets are not accounted for in Sunland's inventory.

26.     To further his Cellular Phone Scheme and defraud Sunland, Borek created master billing accounts with AT&T and Verizon purportedly on behalf of Sunland for the purpose of hiding the charges associated with his Cellular Phone Scheme.  ("False Billing Accounts A and B").  Borek was the only individual with access and control over the False Billing Accounts. Borek transferred account balances from Sunland's operating accounts with AT&T and Verizon to False Billing Accounts A and B, respectively, to create the appearance of a credit to the operating accounts, with the intent of deceiving and defrauding Sunland in furtherance of his Cellular Phone Scheme.

27.     To further his Cellular Phone Scheme and defraud Sunland, in April 2016, Borek fraudulently created a Sunland email address for "Charles L. Meyer" stylized as "clmyer@sunlandconstruction.com" and created an email signature block identifying "Charles L.

Meyer" as the President and CEO of Sunland.  However, in April 2016, Sunland's President and CEO was Craig V. Meier.

28.     On or about April 14, 2016, Borek, with the intent to defraud Sunland and deceive Verizon, sent two emails from his Sunland email account to "Charles L. Meyer" at clmeyer@sunlandconstruction.com regarding "zero use" phone lines Sunland had with Verizon. One of these emails contained a carbon copy (i.e., a "cc") to Alva West, but Borek intentionally misspelled West's email address so West would not actually receive the email, and, further, Verizon would be misled into assuming Borek's emails were legitimate.

29.     On April 15, 2016, Borek, with the intent to further his Cellular Phone Scheme and defraud Sunland, used Sunland's computer equipment and network accounts providing electronic mail to cause an email to be sent from the account of the fake CEO "Charles L. Meyer" to the Verizon account representative, which stated:  "I ask that you and your team continue to work directly with Richard [Borek] to resolve concerns on the Verizon front. As a valued member of senior management Richard [Borek] has the authority to act in a full decision making capacity for Sunland's interests."  The email further informed Verizon that only office managers or Borek could submit requests to Verizon for wireless devices and states, "should you need anything that Richard [Borek] cannot assist you with please feel free to email me directly."

30.     By creating the Sunland email account for "Charles L. Meyer" and causing at least one email to be sent from "Charles L. Meyer" to a Verizon account representative authorizing Borek to negotiate with Verizon on behalf of Sunland, Borek was able to further his fraudulent scheme while keeping his conduct hidden from Sunland.

31.     In addition to creating a phony email address for "Charles L. Meyer", Borek breached Sunland's policies and procedures regarding use of the Company's networks providing

electronic mail service and exceeded his authorized access to such networks by accessing the Company email accounts and reading emails sent and received by Sunland CFO Alva West, President and CEO Craig Meier, Lead Database Administrator and Sharepoint Developer Susan Tischler, and Director of Accounting and Controls, Ashley Collette.

32.     As Sunland's IT Manager, Borek had administrative rights to the email accounts of Sunland employees.  However, at no time was Borek authorized to access any email account except for security and maintenance purposes in accordance with the Sunland Companies' Information Technology Policies.

33.     In the summer of 2016, the number of cellular phones Borek ordered from Verizon prompted Verizon to contact Susan Mayeaux, Sunland's Accounts Payable Manager, via email for approval of cellular phone sales to Sunland.  Mayeaux forwarded Verizon's request from Verizon to Collette.  Because Borek was monitoring Collette's email account, he saw Mayeaux's forwarded Verizon email and intervened.  Borek assured Mayeaux and Collette that he was working out the issue with Verizon in order to obtain the necessary approval from Mayeaux and Collette for purchase of the cellular phones.

34.     In furtherance of his Cellular Phone Scheme, Borek used Sunland's computer equipment, software, operating systems, storage media, network accounts providing electronic mail, World Wide Web browsing, and/or file transfer protocol to instruct AT&T to ship the cellular phones to his attention at 605 Lagneaux Road, Duson, Louisiana 70529, which is the physical address for Borek Automotive Group, L.L.C. owned by Borek and his wife, Christy Borek. Upon information and belief, Borek also provided similar delivery instructions to Verizon.

35.     Sunland does not maintain any business operations at 605 Lagneaux Road, Duson, Louisiana, 70529.

36.     The following are examples of Borek's fraudulent acts of ordering cellular phones using Sunland's billing account with AT&T, to be paid by Sunland, and directing the phones to be delivered to Borek at the address for Borek Automotive Group located at 605 Lagneaux Road, Duson, Louisiana, 70529:

    a.   On or about March 10, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Apple iPhone 6S 16GB cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson LA 70529." Borek further directed a $3,249.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

    b.   On or about June 7, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Apple iPhone 6S 16GB cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson LA 70529." Borek further directed a $3,249.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

    c.   On or about June 8, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Apple iPhone 6S 16GB cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson LA 70529." Borek further directed a $3,249.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

    d.   On or about June 13, 2016, Borek used a Sunland computer to access his Sunland email account to send an email a Corporate Solutions representative at AT&T

who, upon information and belief, was located outside of Louisiana, requesting an order of seventy-five (75) Galaxy Note 5 devices. Borek requested shipment of these phones to "ATTN: Richard Borek 605 Lagneaux Road Duson LA 70529." Borek requested that the phone numbers associated with these cellular phones maintain "Sunland Construction" user names.

e.  On or about July 19, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Samsung SMG930A cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson LA 70529." Borek further directed a $3,474.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

f.  On or about July 20, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Samsung SMG930A cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson, LA 70529." Borek further directed a $3,474.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

g.  On or about July 21, 2016, Borek submitted an online order to AT&T and directed the shipment of ten (10) Samsung SMG930A cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson, LA 70529."  Borek further directed two separate $3,474.95 charges totaling $6949.90 for the cellular phones to be posted to Sunland's billing account with AT&T.

h.  On or about July 22, 2016, Borek submitted an online order to AT&T and directed the shipment of ten (10) Samsung SMG930A cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson LA 70529."  Borek further directed two

separate charges for $3,474.95, totaling $6949.90, for the cellular phones to be posted to Sunland's billing account with AT&T.

i. On July 23, 2016, Borek submitted an online order to AT&T and directed the shipment of five (5) Samsung SMG930A cellular phones to "ATTN: Richard Borek 605 Lagneaux Rd. Duson, LA 70529." Borek further directed a $3,474.95 charge for the cellular phones to be posted to Sunland's billing account with AT&T.

37.     In or about February 2016, on at least two occasions Borek packaged and shipped cellular phones and/or equipment, previously purchased with Sunland funds, by United States Postal Service to IBS Wireless, Inc., located at 2855 Trinity Square Drive Suite 100, Carrollton, Texas 75006-2347, with the intent and purpose of reselling the stolen cellular phones and/or equipment for his own personal gain. The return label on the shipping labels identified the shipper as "Southern Systems, 402 Sellers Road, Duson, LA 70529" which is also Borek's home address. Southern Systems, upon information and belief, is a company owned by Richard Borek and/or his wife, Christy Borek.

38.     In addition to the cellular phones, between November 2015 and August 2016, Borek also caused Sunland to purchase forty-five (45) Microsoft Surface Pro 4 tablets from CDW.  Only three (3) tablets can be located in Sunland's inventory.  Upon information and belief, Borek kept and/or sold for his own benefit forty-two (42) tablets ("CDW Tablets") valued at more than $97,000.

39.     In the summer of 2016, Sunland investigated its increasing cellular phone costs. As part of its investigation, on or about August 25, 2016, Sunland's Chief Financial Officer, Alva West, met with Borek and discovered that Sunland's owed Verizon approximately

$182,000 at that time for cellular phone services. During the meeting with Borek, West was told by Borek that the AT&T cellular phone bill was approximately $13,225 as of August 2016.

40.     Borek falsely informed West that he was disputing certain charges with Verizon and AT&T and that Sunland was going to receive credits in the amount of $155,000 from Verizon and $93,000 from AT&T. In reality, Borek was using False Billing Accounts A and B to hide the unauthorized, fraudulent charges.

41.     During the August 25, 2016 meeting, West requested documentation of Verizon and AT&T credits from Borek. In response, Borek created and forwarded a fictitious e-mail to West purportedly from a Major Account Manager at Verizon containing the following false information:  (a) credits in the amount of $30,000 owed to Sunland from Verizon; (b) an email address and signature block of a Verizon liaison, and (c) a pending balance adjustment to reflect termination fee waivers from 2015 and 2016, amounting to a $155,262 credit.  Borek sent the false email to West with the intent to deceive West and Sunland into believing Verizon was going to reimburse Sunland $155,262 in credits to further Borek's scheme to defraud Sunland.

42.     On or about August 30, 2016, West spoke with an Associate Director in Strategic Sales at Verizon who confirmed that the emails purportedly sent from Verizon were fictitious and that the information provided in the fictitious emails was false.

43.     On August 25, 2016, West received notification that an electronic Outlook meeting request was sent out on his behalf by Borek.

44.     On August 26, 2016, BT Group, the company AT&T contracted with to manage Sunland's email server, confirmed to West that Borek was accessing the Sunland email accounts of West, Meier, Tischler, and Collette.

45.     On or about August 26, 2016, West and Meier decided to terminate Borek's employment effective Monday August 29, 2016, because of his unauthorized access of employee email accounts.

46.     On August 29, 2016, Borek resigned his employment with Sunland via email.

47.     Following his resignation, Borek returned the Sunland property in his possession, including two laptop computers.  However, Borek removed the hard drive from each computer prior to returning to same.

48.     In total, between 2014 and August 2016, Borek used Sunland's computer equipment, software, operating systems, storage media, network accounts providing electronic mail, World Wide Web browsing and/or file transfer protocol, to cause Sunland to purchase 3,376 cellular phones from AT&T and Verizon and the 42 CDW Tablets so that he could resell them for his own personal benefit.

49.     Verizon, AT&T, and CDW charged Sunland for the cellular phones, the charges and fees associated with maintaining the phone, text, and data services associated with each cellular phone), and the CDW Tablets.  Sunland's net loss to Verizon, AT&T, and CDW as a result of Borek's fraudulent Cellular Phone Scheme exceeds $2.4 million.

**Borek's Fraudulent "Statix Scheme": Borek Created Statix Enterprises, LLC to Double Bill Sunland More than $200,000 for His Own Personal Financial Gain.**

50.     On or about November 18, 2015, during his employment with Sunland, Borek created Statix, a Texas limited liability company. Borek is the managing and sole member of Statix.

51.     Borek created Statix to fraudulently obtain money from Sunland for various services and equipment that Statix never intended to, and did not, provide to Sunland.

52.     In furtherance of his Statix Scheme, Borek used Sunland's computer equipment, operating systems, software, storage media, and/or network accounts providing electronic mail, World Wide Web browsing, and/or file transfer protocol ("Sunland's IT Systems") to create, and complete a Sunland "ACH Credit/Debit Agreement Form," a voided Statix check bearing check number 99473, and a W9 form for Statix.  The Statix check had the same bank routing number as Borek's personal checking account.  Upon information and belief, Borek typed the 99473 check number onto the Statix check to give the false impression that the Statix bank account was previously opened for an extended period of time.

53.     On or about November 23, 2015, in furtherance of his Statix Scheme, Borek used Sunland's IT Systems to forward the fraudulent W9 form for Statix to Susan Mayeaux for the purpose of getting Statix approved as a vendor.  Statix was ultimately approved as a vendor of Sunland.

54.     In addition to the fraudulent W9 form, Borek's November 23, 2015, email to Mayeaux also included an invoice from Statix to Sunland in the amount of $28,269.06 for fifty-two (52) "CDMA Router[s]Verizon, fifty-two (52) "CDMA Router Antenna[s]", two hundred two (202) "Logitech Headset- USB" devices, two hundred two (202) "Samsung Mouse-USB" devices, two (2) "Sonic LTE Booster – DATA only" devices, two (2) "Sonic Mounting Kit" devices, one (1) "APC Batt. Back-Up System", and fifty-two (52) "HP Mobile Scanner" devices. In accordance with Borek's request, Mayeaux provided him with a physical check for payment of the invoice so that he could make a copy and deliver it to Statix via FedEx. Despite Sunland's payment, Statix never provided the devices identified in the invoice dated November 20, 2015 to Sunland.

55.     On or about December 9, 2015, in furtherance of his Statix Scheme, Borek used Sunland's computer equipment, printers, software, operating systems, storage media, and/or network accounts providing electronic mail, World Wide Web browsing, and/or file transfer protocol to forward the fraudulent ACH Credit/Debit Agreement Form and voided Statix check bearing check number 99473 from the email address "ar@mystatix.com" which reflected Borek's name as the account holder  to his Sunland email account, and thereafter forwarded that email (and subsequently changed the account holder's name from "Richard Borek" to "Anna Modicz") from his Sunland email account to Mayeaux for the purpose of establishing a payment method for the Statix invoices Borek would send to Sunland ("Statix Payment Method").

56.     From approximately December 2015 through August 2016, Borek, through Statix (while using the email account ar@mystatix.com), continued to bill Sunland for fictitious web hosting services, Microsoft product licenses, computers, accessories, consulting hours, and internet connectivity.  Borek caused Sunland to pay for these fraudulent invoices via wire transfer in accordance with the Statix Payment Method for his own personal financial gain.

57.     Although Sunland paid Statix for the aforementioned services and products, Sunland never received any services or equipment from Statix.

58.      In furtherance of his Statix Scheme to defraud Sunland, Borek used Sunland's computers, software, printers, and copiers to create Statix's fraudulent invoices. Borek then scanned the fraudulent invoices to himself using the ar@mystatix.com email address (which listed Richard Borek as the email account name) and then used Sunland's email system to forward the fraudulent email and invoices to Ms. Mayeaux and changing the email account name to Anna Modicz).  In his emails, Borek provided his authorization for Sunland to pay the fraudulent Statix invoices and requested Ms. Mayeaux pay such invoices by wire transfer from

Sunland's Bank Account located at JP Morgan Chase Bank, N.A to Statix's Bank Account at  JP

Morgan Chase Bank, N.A., which she did based on Borek's misrepresentations.

59.     In addition to the fraudulent invoice Borek emailed to Mayeaux on November 23,

2015, with the intent to receive $28,269.06 via check to Statix for his own personal financial

gain, Borek committed the following acts, resulting in fraudulent payments by Sunland to Borek

through Statix:

      a.  On or about December 9, 2015, Borek sent or caused to be sent using wire

          communication an email to Mayeaux containing Statix Invoice No. 8185593 in

          the amount of $9,125.00 for thirteen (13) "Consultation Hours", one (1)

          "Symantic Mail Archiving Set-Up" service, five (5) Project Planning for Email"

          services, and one (1) "Project Management Fee," which products or services

          Statix knowingly did not intend to provide and did not provide to Sunland.  On or

          about December 22, 2015, Sunland sent Statix a wire transfer to JP Morgan Chase

          Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent

          services. As a result, Borek fraudulently received $9,125.00 via wire transfer to

          Statix, for his own personal financial gain.

      b.  On or about January 2, 2016, Borek sent or caused to be sent using wire

          communication an email to Mayeaux containing Statix Invoice No. 8185639 in

          the amount of $13,960.00 for thirty-one (31) "Consultation Hours", one (1)

          "SPAM Filter Integration", eleven (11) "Project Planning for Email" service, and

          one (1) "Project Management" fee, which products or services Statix knowingly

          did not intend to provide and did not provide to Sunland.  On or about January 13,

          2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account

ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $13,960.00 via wire transfer to Statix, for his own personal financial gain.

c.   On or about January 15, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8185797 in the amount of $68,303.91 for two hundred nineteen (219) "Dell Chromebook" laptops, two hundred nineteen (219) "Protection Plan – 2 [year]", two hundred nineteen (219) "Screen Protectors", and one (1) "Shipping and Handling" fee, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about January 15, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $68,303.91 via wire transfer to Statix, for his own personal financial gain.

d.   On or about February 3, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8185993 in the amount of $9,819.50 for five hundred fourteen (514) "Hosted Exchange Email/user" services, one (1) "Monitoring/monthly" service, twenty-two (22) "Consultation/per hour" services, and one (1) "50 Mb Cross Connect/monthly" service, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about February 17, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $9,819.50 via wire transfer to Statix, for his own personal financial gain.

e.  On or about March 16, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8186113 in the amount of $9,143.30 for five hundred eighteen (518) "Hosted Exchange Email/user" services, one (1) "Monitoring/monthly" service, eighteen (18) "Consultation/per hour" services, and one (1) "50 MB Cross Connect" service, which products or services Statix knowingly did not intend to provide and did not provide to Sunland. On or about April 6, 2016, Sunland sent Statix a wire transfer to a JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $9,143.30 from Sunland via wire transfer to Statix, for his own personal financial gain.

f.  On or about April 13, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8187218 in the amount of $8,685.90 for twenty (20) "Dell Chromebook 2 AMD 4GB" laptops, twenty (20) "Logitec Wireless Mouse" devices, three (3) "Wilson Mobile LTE Booster" services and one (1) "Shipping - Fed-Ex" fee, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about April 13, 2016, Sunland sent Statix a wire transfer to a JP Morgan Chase Bank, N.A. account ending in −1389, which Borek controlled, for such fraudulent services.  As a result, Borek fraudulently received $8,685.90 from Sunland via wire transfer to Statix, for his own personal financial gain.

g.  On or about April 22, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8187597 in

the amount of $9,908.75 for five-hundred twenty nine (529) "Hosted Exchange Email/user" services, one (1) "Monitoring/monthly" service, twenty-two (22)"Consultation/per hour" services, and one (1) "50Mb Cross Connect/monthly" service, which products or services Statix knowingly did not intend to provide and did not provide to Sunland. On or about April 27, 2016, Sunland sent Statix a wire transfer to a JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $9,908.75 from Sunland via wire transfer to Statix, for his own personal financial gain.

**h.** On or about May 2, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8188122 in the amount of $9,220.65 for five hundred and thirty-one (531) "Hosted Exchange Email/user" services , one (1) "Monitoring/monthly" service, eighteen (18) "Consultation/per hour" services, 1 "50 Mb Cross Connect/monthly" services, which products or services Statix knowingly did not intend to provide and did not provide to Sunland. On or about May 4, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $9,220.65 from Sunland via wire transfer to Statix, for his own personal financial gain.

**i.** On or about May 10, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8188681 in the amount of $30,463.96 for fifty-three (53) "MS Windows Core CAL" software

20

programs, fifty-three (53) "MS Exchange CAL" software programs, twelve (12) "MS Project Pro 2013" software programs, fifty-three (53) "MS Office Pro 2013" software programs, fifty-three (53) "MS DataCenter CAL" software programs, fifty-three (53) "MS SharePoint 2012 CAL" software programs, and fifty-three (53) "Software Assurance" software programs, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about May 18, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $30,463.96 from Sunland via wire transfer to Statix, for his personal financial gain.

j.   On or about June 6, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8189913 in the amount of $9,932.55 for five hundred thirty three (533) "Hosted Exchange Emails/user" services, one (1) "Monitoring/monthly" service, twenty-two (22) "Consultation/per hour" services, and one (1) "50 Mb Cross Connect/monthly" service, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about June 8, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $9,932.65 from Sunland via wire transfer to Statix, for his own personal financial gain.

k.   On or about July 5, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8202997 in

the amount of $10,300.40 for five hundred six (536) "Hosted Exchange Emails/user" services, one (1) "Monitoring/monthly" Service, twenty-four (24) "Consultation/per hour" services, and one (1) 50 "Mb Cross Connect/monthly" services, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about July 7, 2015, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $10,300.40 via wire transfer to Statix, for his own personal financial gain.

l.   On or about August 1, 2016, Borek sent or caused to be sent using wire communication an email to Mayeaux containing Statix Invoice No. 8210229 in the amount of $10,727.75 for five hundred forty-nine (549) "Hosted Exchange Emails/user" service, one (1) "Monitoring/monthly" service, twenty-six (26) "Consultation/per hour" services, and one (1) "Mb Cross Connect/monthly" service, which products or services Statix knowingly did not intend to provide and did not provide to Sunland.  On or about August 3, 2016, Sunland sent Statix a wire transfer to JP Morgan Chase Bank, N.A. account ending in -1389, which Borek controlled, for such fraudulent services. As a result, Borek fraudulently received $10,727.75 via wire transfer to Statix, for his own personal financial gain.

60.   Upon information and belief, some or all of the money transactions described above were electronically transferred outside the state of Louisiana.

61.     The products and services for which Borek, through Statix, billed Sunland were already purchased by Sunland from AT&T, Dell, CDW, and other vendors, which Borek knew or should have known, since his duties as IT Manager included maintaining inventory of technology hardware, software, licenses, and resources, as well as negotiating license agreements and asset purchase agreements with vendors.  Borek was responsible for approving vendor bills sent to the Sunland Accounts Payable Department.

62.     Between November 2015 and August 2016, as a result of Borek's creation of the Statix invoices for work that was never performed and/or for equipment that was never provided to Sunland, and his approval for Sunland to pay these invoices, Borek caused Sunland to make thirteen (13) separate payments to Statix totaling more than $230,000 through Automated Clearing House ("ACH") electronic transfers directly to Statix's bank account and/or by check.

63.     Additionally, to further his Cellular Phone Scheme, on or around July 13, 2016 and August 11, 2016, Borek submitted two cashier checks drawn from Statix's checking account ending in -1389 to AT&T outside of Louisiana for Sunland's AT&T Account No. 999783396, and Sunland's AT&T Foundation Account No. BES 00117194 without Sunland's knowledge or approval in order to prevent the accounts from becoming delinquent.  Upon information and belief, Borek purchased and mailed these cashier checks to AT&T.

64.     On or about August 31, 2016, Borek also attempted to send a payment to Sunland's Verizon Accounts from Borek's Statix checking account ending in -1389 without Sunland's knowledge or approval in order to prevent that account from becoming delinquent. However, Verizon rejected this payment because the payment was not from Sunland.

## COUNT I:
## 18 U.S.C. § 1030 COMPUTER FRAUD ABUSE ACT

65.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as if fully set forth herein.

66.    Borek is liable to Sunland under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, because he knowingly and with intent to defraud, accessed a protected computer in excess of his authorization as Sunland's IT Manager, and by means of such conduct furthered his Cellular Phone Scheme and Statix Scheme to obtain property, including money, belonging to Sunland. 18 U.S.C. § 1030(a)(4).

67.    Sunland's Employee and Safety Handbook states that the company maintains electronic communications (defined as email, voicemail, and internet) for the purpose of conducting company business. The Handbook goes on to state that employees who use electronic communications for any improper purpose will be subject to discipline, up to and including termination from employment.

68.    Borek intentionally accessed a computer and/or computers owned by Sunland for improper purposes described herein, such that his access exceeded his authority as set forth in Sunland's Employee and Safety Handbook.

69.    The computer(s) Borek accessed belonged to Sunland and were used in Sunland's business of providing pipeline construction and related services throughout the United States. Accordingly, the computer(s) was/were computers used in interstate commerce and are/were covered by the CFAA.

70.    Sunland's company policies limit employees to using computer equipment, software, printers, operating systems, storage media, network accounts, World Wide Web browsing, and file transfer protocol for business purposes only, and prohibit any such use that is

for an improper purpose.  Sunland's policies expressly prohibit employees from engaging in any activity that is illegal while using Sunland-owned resources, including specifically forging or attempting to forge email messages, disguising or attempting to disguise one's identity, and sending email messages from another person's email account.

71.    Specifically, Borek knowingly and with the intent to defraud Sunland in furtherance of his Cellular Phone Scheme and Statix Scheme described above, utilized protected computer equipment to access and use software, operating systems, storage media, network accounts providing electronic mail, World Wide Web browsing and/or file transfer protocol owned by Sunland in excess of his authority and for the improper purpose of:

   a.   Obtaining 1,874 cellular phones from Verizon, 1,502 cellular phones from AT&T, and forty-two (42) Microsoft Surface Pro 4 tablets from CDW, purchased on Sunland's accounts but which Borek kept for his personal benefit at a value of more than $2.4 million.

   b.   Creating thirteen (13) fake invoices on behalf of Defendant Statix for computer related services and equipment that were never provided to Sunland.

   c.   Delivering fraudulent Statix invoices to Sunland requesting payments to Statix (of which Borek is the managing member) totaling more than $230,000 for fictitious computer related services and equipment which Statix never provided to Sunland.

   d.   Creating an email address for the fictitious "Charles L. Meyer," sending an email from the fictitious "Charles L. Meyer" email address to Verizon informing Verizon that Borek was authorized to deal with Verizon on all matters, and instructing Verizon to contact "Charles L. Meyer" if it needed any information Borek could not provide.

25

e.   Creating a fake email from a Verizon account representative making it appear that Sunland was owed a credit on its operating accounts when in fact the charges were transferred to Sunland's master billing account (of which Borek had sole access).

72.   Borek's unauthorized access of Sunland's computers and networks providing email and World Wide Web access as described above constitutes a violation of the CFAA, 18 U.S.C. § 1030(a)(4), (g).

73.   As a direct and proximate cause of Borek's violation of the CFAA, Sunland incurred economic damages associated with Borek's Cellular Phone Scheme and Statix Scheme, specifically damages related to the cost of the cellular phones and tablets, the amount paid to Statix for computer-related services and equipment that was not provided to Sunland, and costs related to investigating Borek's behavior and attorneys' fees related bringing this lawsuit.

74.   Sunland seeks to recover the misappropriated equipment and the full amount of the economic loss it incurred as a result of Borek's violation of the CFAA.

## COUNT II:

## 18 U.S.C § 1962(c) RACKETEER INFLUENCE AND CORRUPTION ACT

75.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above as if fully set forth herein.

76.   Sunland, at all materials times herein, was engaged in activities and conduct that affected interstate and/or foreign commerce.  Sunland is a "person" as defined pursuant to 18 U.S.C. 1961(3).

77.     Defendant Borek, at all material times herein, was engaged in activities and conduct that affected interstate and/or foreign commerce. Defendant Borek is "person" as the term is defined pursuant to 18 U.S.C. 1961(3).

78.     Defendant Statix is, and at all material times herein was, a corporation formed and organized pursuant to the laws of Texas, and through its submission of its fraudulent invoices to Sunland, a Louisiana company, it was engaged in activities and conduct that affected interstate and/or foreign commerce. Statix is a "person" as the term is defined pursuant to 18 U.S.C. 1961(3).

79.     Defendant Borek, at all times material herein, was the Managing Member of Statix and committed, facilitated, furthered, orchestrated, promoted, and/or otherwise directed and managed the business affairs of Statix.

80.     Defendants Borek and Statix were employed by and associated with each other, and engaged in conduct that constitutes a RICO pattern of racketeering activity pursuant to 18 U.S.C. § 1961(4).

81.     Statix is a RICO enterprise, organized and maintained by and through Borek, in that it conducted fraudulent activity, including but not limited to intentionally submitting thirteen (13) fraudulent invoices to Sunland for fictitious web hosting services, software licenses, computers, accessories, consulting hours and internet connectivity, and causing Sunland to pay more than $230,000 to Statix by delivery of one (1) check, and through twelve (12) separate ACH electronic draft transfers directly to Statix's bank account.  Statix, by and through Borek, also fraudulently paid for a portion Sunland's AT&T bill without Sunland's approval in an attempt to prevent the exposure of Borek's Cellular Phone Scheme.

82.    Upon information and belief the money paid to Statix through wire transfers were transferred outside of Louisiana such that they affect interstate commerce as defined in 18 U.S.C. § 1956(c)(4).

83.    Statix is a separate and distinct entity from Defendant Borek.

84.    Defendant Borek is associated with Statix, a RICO enterprise that is engaged in activities which affect interstate or foreign commerce. Defendant Borek conducted or participated, directly or indirectly, in the conduct of Statix's affairs through a RICO pattern of racketeering activity.

85.    Defendants engaged in fraudulent conduct related to Borek's Statix Scheme and Cellular Phone Scheme described above, which constitutes "racketeering activity," as the term is defined pursuant to 18 U.S.C. § 1961(1).

86.    Defendants' Statix Scheme violated 18 U.S.C. § 1343 (" Federal Wire Fraud") in that Defendants intended to and did defraud Sunland for the purpose of obtaining money in the amount of at least $230,000 through the false and deceptive Statix invoices Borek created and provided to Sunland using the email servers of Sunland, thereby causing Sunland to make 12 wire transfers of funds which were transferred outside Louisiana and, thus, involved wire communications in interstate commerce for the purpose of executing the Statix Scheme to defraud Sunland in violation of 18 U.S.C. § 1343.

87.    Defendants' Statix Scheme and Cellular Phone Scheme violated 18 U.S.C. § 1341 ("Federal Mail Fraud") in that Defendants intended to defraud and did defraud Sunland for the purpose of enabling Borek to obtain cellular phones and tablets with a total value in excess of $2.4 million, through deceptive payments from Statix to AT&T for a portion of Sunland's AT&T accounts, without Sunland's knowledge or authorization, and an attempted deceptive payment

from Statix to Verizon for similar purpose, which payments were mailed to AT&T and Verizon outside of Louisiana for the purpose of executing Borek's Cellular Phone Scheme to defraud Sunland in violation of 18 U.S.C. § 1341.

88.     The "racketeering activity" committed by Defendants is a violation of 18 U.SC. § 2314 ("the National Stolen Property Act") in that Defendants devised and intended to devise a scheme and artifice (the Statix Scheme and the Cellular Phone Scheme, described above) to defraud Sunland and to obtain money or property by means of false or fraudulent pretenses, representations, or promises, and transported or caused to be transported goods and money in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud Sunland of money and property having value in excess of $2.7 million, well more than $5,000 threshold required by RICO, in violation of the National Stolen Property Act 18 U.S.C. § 2314.

89.     The "racketeering activity" committed by Defendants constitutes money laundering within the meaning of 18 U.S.C. §§ 1956 and 1957 in that:

        a.   Defendants knowingly engaged in financial transactions representing unlawful activity (the Statix Scheme and the Cellular Phone Scheme), conducted and attempted to conduct such financial transactions involving proceeds of specified unlawful activities, namely the payment of a portion of Sunland's AT&T bill and the attempt to pay a portion of Sunland's Verizon bill with funds from Statix's checking account, with the intent to promote the carrying on of Borek's Cellular Phone Scheme in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

        b.   Defendants knowingly engaged and attempted to engage in monetary transactions in criminally derived property of value of more than $10,000 which was derived from specified unlawful activity, namely the Statix Scheme and the Cellular Phone Scheme, in violation of 18 U.S.C. § 1957.

90.     The activities and/or conduct engaged in by Defendants described herein constitute a "pattern of racketeering activity," as the term is defined pursuant to 18 U.S.C. § 1961(5). The activities and/or conducted engaged in by Defendants were continuous.

91.     The course of conduct and/or pattern of racketeering activity engaged in by Defendants was malicious, reckless and/or oppressive and was intended to destroy Sunland's ability and right to engage in and maintain Sunland's interest in business and/or property, causing injury to Sunland pursuant to 18 U.S.C. § 1962(c).

92.     As a direct and proximate cause of Defendants RICO violations, Sunland was injured in its business and property by reason of Defendants' violations of 18 U.S.C. 1964(c). The injuries include but are not limited to $230,000 of which Sunland paid to Statix for services that it did not intend to provide and did not perform, the loss of property (cellular phones and tablets) fraudulently obtained by Borek and fraudulently concealed by Borek and Statix, and the total fees and expenses paid by Sunland to investigate and litigate Defendants' fraudulent schemes.

93.     As a result of Defendants' racketeering activity described herein, Sunland is also entitled to threefold the damages it sustained, costs of the suit, and attorney's fees from Defendants pursuant to 18 U.S.C. § 1964(c), as well as any other damages to which Sunland may be entitled at law or equity.

## COUNT III
## CONVERSION AND/OR CIVIL THEFT

94.     Plaintiff incorporates and by reference and re-allege each and every allegation contained above as if fully set forth herein.

95.    Defendants' misappropriation of Sunland's property and/or funds as described herein constitutes unlawful conversion and/or civil theft in violation of La. Civ. Code art. 2315.

96.    Specifically, Defendant Borek misappropriated Sunland's property including but not limited to 1,874 cellular phones from Verizon, 1,502 cellular phones from AT&T, and forty-two (42) Microsoft Surface Pro 4 tablets which he caused Sunland to purchase but which are not located in Sunland's inventory of cellular phones and tablets issued to Sunland employees.

97.    Upon information and belief, Borek sold these cellular phones and tablets for his own monetary gain.

98.    Additionally, Borek and Statix engaged in a fraudulent scheme by creating thirteen (13) invoices on behalf of Defendant Statix,  and delivered the invoices to Sunland requesting payments to Statix totaling more than $230,000 for web hosting services, Microsoft product licenses, computers, accessories, consulting hours, and internet connectivity which Statix never provided to Sunland.

99.    As managing member of Statix, Borek personally benefitted from the payment on the fraudulent Statix invoices.

100.  The aforementioned Sunland property (or its proceeds) and Sunland funds remain in the possession and control of Borek and/or Statix, thereby depriving Sunland use of its property and funds.

101.  As a result of Borek and Statix's conduct, Sunland is entitled to damages equal to the amount of money and the value of the property Defendants misappropriated from Sunland, pre-judgment and post-judgment interest, and costs.

## COUNT IV:
## BREACH OF FIDUCIARY DUTY

102.  Plaintiff incorporates and by reference and re-allege each and every allegation contained above as if fully set forth herein.

103.  As IT Manager of Sunland, Defendant Borek owed Sunland fiduciary duties of fidelity and loyalty.

104.  Borek's intentional misappropriation of property and company funds from Sunland valued at more than $2.7 million, through the fraudulent Cellular Phone Scheme and Statix Scheme, described above, was in furtherance of his own personal, private interests and in opposition to Sunland's business and purpose.

105.  Borek was not authorized to use Sunland's funds and/or property for his personal gain or his own personal interests, or the gain or interests of Statix Enterprises, LLC, of which Borek is a managing member.

106.  Borek's use of company property and/or funds for his own personal benefit or that of Statix Enterprises, LLC, constitutes a breach of his fiduciary obligations of fidelity and loyalty to Sunland.

107.  Borek knowingly and voluntarily breached the fiduciary duties he owed to Sunland by using company property and funds for his own personal use and benefit.

108.  As a result of the forgoing conduct of Borek, Sunland has suffered damages in the amount equal to the amount of funds and value of property misappropriated by Borek.

109.  Sunland is entitled to damages as a result of Borek's breach of fiduciary duties, including reimbursement of the funds and the value of the property Borek misappropriated from Sunland, along with pre-judgment and post-judgment interest, and costs.

## COUNT V:
## UNJUST ENRICHMENT

110.  Plaintiff incorporates and by reference and re-allege each and every allegation contained above as if fully set forth herein.

111.  Defendants' misuse of Sunland's company property and funds as described herein constitutes unjust enrichment for which Sunland is entitled to compensation, should it be found to have no remedy at law. La. Civil Code art. 2298.

112.  By using Sunland's property and funds for their own use and gain, Defendants Borek and Statix enriched themselves and deprived Sunland of the use of its property and funds.

113.  Defendants' aforementioned enrichment was the direct cause of Sunland's aforementioned deprivation.

114.  Defendants were not justified and had no cause of action for either the aforementioned enrichment or deprivation.

115.  In the event Sunland is determined to have no other remedy at law with respect to Defendants' misuse of its corporate property and funds, Sunland is entitled to compensation from Defendants equal to the amount of money Defendants received as a result of the cellular phones and tablets Borek caused Sunland to purchase but which Borek either kept or resold for his own personal benefit, and the amount of money which Statix received from Sunland in connection ith the fraudulent invoices Borek submitted to Sunland on behalf of Statix, under the theory of unjust enrichment.

## PRAYER FOR RELIEF

116.  WHEREFORE Plaintiff Sunland Construction requests that judgment be made and entered in its favor and against Defendants as follows:

a.   Return and/or reimbursement of all property (or proceeds therefrom) owned by Sunland Construction and funds belonging to Sunland Construction, including reimbursement of all payments Sunland made to Statix.

b.   An award of triple damages under 18 U.S.C. § 1964(c).

c.   An award of other monetary damages allowed by law or equity.

d.   An award of all costs and attorneys' fees.

e.   Any such other relief as this Court in its judgment deems just and appropriate.

*/s/ Jennifer L. Englander*
Jennifer L. Englander, La. Bar No. 29572
Atoyia S. Harris, La. Bar No. 36012
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Shell Square, 701 Poydras St., Suite 3500
New Orleans, Louisiana 70139
Telephone: (504) 648-3840
Facsimile: (504) 648-3859
Jennifer.Englander@ogletree.com
Atoyia.Harris@ogletree.com

Attorneys for Sunland Construction, Inc.

29475633.1